IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|                    |   |                 |
|--------------------|---|-----------------|
|                    | : | CIVIL ACTION    |
| KEVIN ALLEN,       | : | NO. 05-6760     |
|                    | : |                 |
| Plaintiff,         | : |                 |
|                    | : |                 |
| v.                 | : |                 |
|                    | : |                 |
| PETSMART, INC.,    | : |                 |
|                    | : |                 |
| Defendant.         | : |                 |

M E M O R A N D U M

EDUARDO C. ROBRENO, J.                          June 1, 2007


Plaintiff Kevin Allen claims that his former employer, PetSmart, Inc, violated the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634, and the Pennsylvania Human Relations Act ("PHRA"), 43 P.S. §§ 951-963, by terminating his employment.  Allen claims that his termination was unlawful because it was based on his age.  PetSmart has filed a motion for summary judgment (doc. no. 10), which, for the following reasons, the Court will grant.


I.   **BACKGROUND**

The salient and largely undisputed facts of this case are as follows.  Mr. Allen began working as a store manager at PetSmart, Inc. ("PetSmart") in December 1998.  He was forty-four years old at that time.  District Manager Gerald Gordon, who is five years senior to Mr. Allen, hired Mr. Allen and was Mr.

Allen's immediate supervisor.  In July 2004, at Mr. Allen's own request, Mr. Gordon transferred Mr. Allen to work as the store manager of a PetSmart in Plymouth Meeting, Pennsylvania.

In April 2004, Paul Bergen, only four years junior to Mr. Allen, became the Regional Vice President of PetSmart's Northeast Region.  Mr. Bergen's pet peeve was pet loss, and he was particularly concerned with the amount of pet loss in the Philadelphia District, where Mr. Allen's store was located.  He asked Roger Dawson, the Regional Pet Care Manager, to identify the Philadelphia managers with the worst performance in pet care and to raise the bar for pet care in their stores.  In response, Mr. Bergen identified Joe Frost, Al Dubeck, and Mr. Allen.

Mr. Dawson also informed Mr. Gordon that Mr. Allen store was among the worst.  As a result, on November 4, 2004, Mr. Gordon placed Mr. Allen on a Performance Improvement Plan ("PIP").  The PIP stated that "failure to follow through with this plan and continued performance problems may result in the termination of employment."  Deft.'s Mot., Ex. 1.  The PIP admonished Mr. Allen to "ensure that all policies and procedures are followed in the Pet Care Department.  Lives lost must improve to company average."  Id.  A 30-day follow-up of Mr. Allen's PIP, however, revealed continued deficiencies in pet care.

In December 2004, the fish tank system in Mr. Allen's store malfunctioned.  Although an electrician came to the store

and temporarily fixed the system, the filtration system still was
not operating properly.  Mr. Allen attempted to fix the problem
himself, but this attempt resulted in a temperature drop that
caused a substantial amount of fish to die.  Two months passed
without the fish tank malfunction being fully resolved.

Around this time, Jean LeCasse became the District
Manager for the Philadelphia District and Cynthia Wilkerson
became the interim District Manager for the Delaware Market.  Ms.
Wilkerson also assisted Mr. LaCasse with his new position.  On
January 5, 2005, Mr. LaCasse and Ms. Wilkerson performed a 60-day
follow-up of Mr. Allen's PIP, which resulted in a warning that,
"[a]lthough issues within the Pet Care department were addressed
on previous visits, many Policies and Procedures were still not
being followed during this visit, putting the pets in this store
at risk."  Dft.'s Mot., Ex. 4.

On February 11, 2005, Ms. Wilkerson made another visit
to Mr. Allen's store.  Ms. Wilkerson found employees rushing
around the pet care area who informed her "that they had a major
fish loss and that the tanks and system had been overflowing and
that the temperature was low in the tanks."  Wilkerson Dep. at
35.  Ms. Wilkerson claims that during the crisis, Mr. Allen was
not assisting his associates, but rather, was standing in one of
the back aisles stocking dog food.

After the incident, Ms. Wilkerson made a phone call to

Mr. Bergen to express concern that Mr. Allen "lacked a sense of urgency . . . dealing with the loss of the fish and the continued dropping of the temperature." Wilkerson Dep. at 43-45. Mr. Bergen asked for Ms. Wilkerson's opinion of the situation, and she said that, "because of his lack of urgency and care for the animals, I felt as though [Mr. Allen] should be separated from our employment." Id. at 44. Mr. Bergen said that Ms. Wilkerson needed to talk to Patricia Giordano, a PetSmart human resources director.[1] Ms. Wilkerson called Ms. Giordano, explained the entire situation to her, and then called Mr. Bergen "to let him know what [Ms. Giardano] had said and everybody was then in agreement with the separation of employment." Id. at 44-45. Mr. Allen was then terminated that same day.

## II.  DISCUSSION

### A.   Standard for Summary Judgment

A court may grant summary judgment only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

---

[1]   As Mr. Bergen explained it, he did not "fully make the decision to terminate." Bergen Dep. at 48.  He testified that, for a termination decision, he required the recommendation of the human resources department based on all of the facts, and then termination "would be a three-way decision between the district manager, the HR department, and myself." Id.

the moving party is entitled to judgment as a matter of law."
Fed. R. Civ. P. 56(c).  A fact is "material" only if its
existence or non-existence would affect the outcome of the suit
under governing law.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S.
242, 249 (1986).  An issue of fact is "genuine" only when there
is sufficient evidence from which a reasonable jury could find in
favor of the non-moving party regarding the existence of that
fact.  <u>Id.</u>  In determining whether there exist genuine issues of
material fact, all inferences must be drawn, and all doubts must
be resolved, in favor of the non-moving party.  <u>Coregis Ins. Co.
v. Baratta & Fenerty, Ltd.</u>, 264 F.3d 302, 305-06 (3d Cir. 2001)
(citing <u>Anderson</u>, 477 U.S. at 248).

        Although the moving party bears the burden of
demonstrating the absence of a genuine issue of material fact,
where the non-moving party is the plaintiff, who bears the burden
of proof at trial, that party must present affirmative evidence
sufficient to establish the existence of each element of his
case.  <u>Coregis</u>, 264 F.3d at 306 (citing <u>Celotex Corp. v. Catrett</u>,
477 U.S. 317, 323 (1986)).  "[S]ummary judgment is essentially
'put up or shut up' time for the non-moving party: the non-moving
party must rebut the motion with facts in the record and cannot
rest solely on assertions made in the pleadings, legal memoranda,
or oral argument."  <u>Berckeley Inv. Group, Ltd. v. Colkitt</u>, 455
F.3d 195, 201 (3d Cir. 2006).

   B.   The McDonnell Douglas Paradigm

        In McDonnell Douglas Corp. v. Green, the Supreme Court
created a three-step paradigm for structuring the presentation of
indirect evidence of discriminatory treatment cases under Title
VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-1 et seq.
411 U.S. 792 (1973).[2]  Under the McDonnell Douglas scheme, the
plaintiff first must "produce evidence that is sufficient to
convince a reasonable factfinder to find all of the elements of a
prima facie case."  Keller v. Orix Credit Alliance, Inc., 130
F.3d 1101, 1108 (3d Cir. 1997) (quoting St. Mary's Honor Center
v. Hicks, 509 U.S. 502, 506 (1993)).

        If the plaintiff succeeds in satisfying a prima facie
case, the burden of production shifts to the employer to
"articulate some legitimate, nondiscriminatory reason for the
employee's rejection."  McDonnell Douglas, 411 U.S. at 802.  Once
the employer meets this relatively light burden by articulating a
legitimate reason for the unfavorable employment decision, the
burden rebounds to the plaintiff, who must then show by a

_____

        [2]   McDonnell Douglas's same general standards and analyses
are applicable to a plaintiff's ADEA and PHRA claims.  Jones v.
School Dist. of Philadelphia, 198 F.3d 403, 410-11 (3d Cir. 1999)
(Title VII and PHRA); Gomez v. Allegheny Health Serv., Inc., 71
F.3d 1079, 1083-84 (3d Cir.1995), cert. denied, 518 U.S.
1005(1996)(same); Newman v. GHS Osteopathic, Inc., Parkview
Hosp., 60 F.3d 153, 156-57 (3d Cir. 1995)(Title VII and ADEA);
Griffiths v. Cigna Corp., 988 F.2d 457, 469 n. 10 (3d Cir. 1993),
cert. denied, 510 U.S. 865 (1993)(same).

preponderance of the evidence that the employer's explanation is
pretextual.  Fuentes v. Perskie, 32 F.3d 759, 763 (3d Cir. 1994).
At this point, "the McDonnell Douglas framework--with its
presumptions and burdens--is no longer relevant."  St. Mary's
Honor Ctr. v. Hicks, 509 U.S. 502, 510 (1993).  "The defendant's
'production' (whatever its persuasive effect) having been made,
the trier of fact proceeds to decide the ultimate question:
whether plaintiff has proven that the defendant intentionally
discriminated against [her]" based on her sex.  Id. (internal
quotations omitted).  See also Reeves v. Sanderson Plumbing
Prods., Inc., 530 U.S. 133, 143 (2000) ("Although intermediate
evidentiary burdens shift back and forth under this framework,
the ultimate burden of persuasion remains at all times with the
plaintiff.") (internal quotation and citation omitted).

        At the summary judgment stage, after the employer has
articulated why it terminated the plaintiff, the plaintiff may
"survive summary judgment . . . by submitting evidence from which
a factfinder could reasonably either (1) disbelieve the
employer's articulated reasons; or (2) believe that an invidious
discriminatory reason was more likely than not a motivating or
determinative cause of the employer's actions."  Fuentes, 32 F.3d
at 764.  As the Third Circuit has explained:

             To discredit the employer's proffered reason,
             however, the plaintiff cannot simply show
             that the employer's decision was wrong or
             mistaken, since the factual dispute at issue

is whether discriminatory animus motivated
the employer, not whether the employer is
wise, shrewd, prudent, or competent.  Rather,
the non-moving plaintiff must demonstrate
such weaknesses, implausibilities,
inconsistencies, incoherencies, or
contradictions in the employer's proffered
legitimate reasons for its action that a
reasonable factfinder could rationally find
them "unworthy of credence," and hence infer
"that the employer did not act for [the
asserted] non-discriminatory reasons."  While
this standard places a difficult burden on
the plaintiff, "it arises from an inherent
tension between the goal of all
discrimination law and our society's
commitment to free decisionmaking by the
private sector in economic affairs."

Id. at 765 (internal citations omitted).


   C.   Application

      1.   The Prima Facie Case.

      When the plaintiff alleges unlawful discharge based on

age, the prima facie case requires proof that (i) the plaintiff

was a member of the protected class, i.e., was 40 years of age or

older (see 29 U.S.C. § 631(a)), (ii) that the plaintiff was

discharged, (iii) that the plaintiff was qualified for the job,

and (iv) that the plaintiff was replaced by a sufficiently

younger person to create an inference of age discrimination.

Keller v. Orix Credit Alliance, 130 F.3d 1101, 1108 (3d Cir.

1997) (citing Sempier v. Johnson & Higgins, 45 F.3d 724, 728 (3d

Cir.), cert. denied, 515 U.S. 1159 (1995).  Here, PetSmart has

effectively conceded that Mr. Allen has made out a prima facie

case by not raising or discussing the issue in its motion.

2.   PetSmart's Articulated Reason for Termination.

The burden shifts to PetSmart, which has, in turn, met its burden of articulating "some legitimate, nondiscriminatory reason" for Mr. Allen's termination.  See McDonnell Douglas, 411 U.S. at 802.  In fact, PetSmart has proffered two such reasons: First, "despite repeated warnings, the polices and procedures for all pets were not being followed [by Mr. Allen], thereby putting the pets in his store at risk."  Dft.'s Mem. at 14.  Second, "[Mr. Allen] failed to take appropriate action in response to problems with his aquatic system, and he demonstrated a complete disregard for the lives of the fish in his store."  Id.

3.   Mr. Allen's Evidence that PetSmart's Articulated
     Reasons for his Termination are Pretextual

The burden now rebounds to Mr. Allen, who must show by a preponderance of the evidence that PetSmart's proffered reasons are pretextual.  See Fuentes, 32 F.3d at 763.

(a) Pet Care Performance

PetSmart's first articulated reason for terminating Mr. Allen is that he performed poorly in managing his store's Pet Care Department, thereby putting the pets in his store at risk. Mr. Allen does not contend that there were no problems with his

pet care performance.  Rather, Mr. Allen points to (1) the
increase in criticism of Mr. Allen after Mr. Bergen became
Regional Vice President; (2) the fact that poor pet care
performance was not uncommon among various PetSmart stores; and
(3) the alleged favorable treatment of younger store managers,
with similarly poor pet care departments, as compared to older
store managers.  As discussed more fully below, Mr. Allen has
failed to provide the Court with evidence sufficient to discredit
PetSmart's first proffered reason or to raise a reasonable
inference of pretext.

(i)  Mr. Bergen's Increased Criticism

        Vice President Bergen appears to be the only individual
whom Mr. Allen specifically accuses of age discrimination.[3]
However, Mr. Allen points to no evidence that Mr. Bergen's role
in his termination was colored by any discriminatory animus.  He
does not contend that Mr. Bergen or anyone else ever made any
discriminatory comments about his age.  Pl.'s Dep. at 40-41.  Nor
does he point to any other evidence that Mr. Bergen was motivated
by age discrimination when he approved Ms. Wilkerson's request to
terminate him.  To the extent that Mr. Bergen placed more
emphasis on pet care and discipline, the ADEA does not prohibit

_____

        [3]   At his deposition, Mr. Allen testified that the
"instructions of termination" came from Mr. Bergen "because all
roads led back to him."  Allen Dep. at 122-23, 186-87.

-10-

new supervisors from having "different priorities or a lower degree of tolerance for certain failings than [a] predecessor." Angelico v. Agilent Techs., No. 06-348, 2006 WL 2854377, at *5 (E.D. Pa. Oct. 3, 2006).  Certainly, standards of pet care in a pet store is not an unreasonable subject for concern and attention.

Mr. Allen's own unsubstantiated, subjective beliefs or suspicions alone would not suffice to persuade a rational trier of fact that age was a factor in the termination decision. Rizzo v. PPL Serv. Corp., 2005 WL 913091, at *11 (E.D. Pa. Apr. 19, 2005); see also Robertson v. Allied Signal, Inc., 914 F.2d 360, 382 n.12 (3d Cir. 1990) (noting that an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment); Martin v. Healthcare Bus. Res., 2002 WL 467749, at *5 (E.D. Pa. Mar. 26, 2002) ("Plaintiff's mere pronouncement or subjective belief that she was terminated because of her race, gender and age is not a substitute for competent evidence.").  On this record, Mr. Allen's beliefs and suspicions are not borne out by any facts, disputed or otherwise, presented to the Court.

(ii) Mr. Allen's Pet Care Performance

Mr. Allen also points to the fact that Mr. Gordon testified that he could walk into any Petsmart location and find

-11-

something wrong in that department.  While the record demonstrates that there may have been some problems in every PetSmart store in the district, it also demonstrates that the pet care problems in Mr. Allen's store were among the worst.

Mr. Dawson testified that Mr. Allen's store "would fall in the category of some of the worst I'd seen."  Dawson Dep. at 16.  The fish tanks were dirty to the point that he "couldn't imagine a customer wanting to buy a fish from them."  Id.  The conditions in the new arrival room for the pets' initial quarantine period and quiet room for treating sick pets were also "certainly not good."  Id. at 17.  Mr. Dawson was also concerned about the lack of improvements in the store conditions and Mr. Allen's overall "lack of involvement in the pet care department."

Mr. Gordon believed that Mr. Allen's pet care department was one of "the worst three that we had."  Gordon Dep. at 273-74.  Mr. Gordon observed for himself "unsanitary conditions" in Mr. Allen's store that were significantly worse than the conditions in the Pet Departments at other stores in the District.  Gordon Dep. at 67-68.  Mr. LaCasse also testified that Mr. Allen's store was one of "the worst two I had ever seen in the company and I've probably seen a hundred or more."  LaCasse Dep. at 111-12.

Indeed, Mr. Allen's own testimony supports the proposition that conditions at his Plymouth Meeting store were

-12-

among the worst. Four months prior to his being placed on a PIP, in July of 2004, Mr. Gordon had transferred Mr. Allen to the Plymouth Meeting store at Mr. Allen's own request.  Mr. Allen had asked for this transfer because he was "bored" at his old store, "felt that [he] had done everything that [he] could do" there, and needed "larger challenges."  Pl. Dep. at 41.  He requested the Plymouth Meeting store because he "had knowledge of its deficiencies" and thought it would provide him the kind of challenge he wanted.  <u>Id.</u> at 42.  Unfortunately for Mr. Allen, whether it was his fault or not, the problems at the Plymouth Meeting store were not adequately addressed while the store was under his leadership.

(iii)   <u>Differential Treatment</u>

Mr. Allen contends that only older store managers were placed on PIPs and that younger store managers who had similar performance problems were not disciplined or terminated.  Mr. Allen maintains that, while there were at least sixteen managers in the Philadelphia district, all three of the managers singled out for discipline were over the age of forty.  Mr. Allen contends this evidence raises an inference of discriminatory animus sufficient to survive summary judgment.

The record does not support Mr. Allen's contention that PetSmart only singled out older managers for poor performance.

-13-

The only evidence regarding the treatment of younger store managers that Mr. Allen points to is his own testimony.  <u>See</u> Pl.'s Brf. at 7.  However, Mr. Allen's testimony regarding the conditions at the younger manager's stores, with one exception,[4] is based on "passing conversations" he had with other store managers.  Pl. Dep. at 129.  The Court may not consider such secondhand testimony on a motion for summary judgment because it constitutes hearsay.  <u>See</u> Fed. R. C. P. 56(e); <u>Holt Cargo Sys., Inc. v. Delaware River Port Authority</u>, 20 F. Supp. 2d 803, 839 (E.D. Pa. 1998) (holding that in response to motion for summary judgment, the adverse party is required to submit materials "as would be admissible in evidence.").  Mr. Allen does not point to any exception to the hearsay rule which would make the testimony admissible under these circumstances.

Mr. Allen's largely hearsay testimony is also simply mistaken.  PetSmart has provided evidence that it did not just single out older managers for poor performance.  It is undisputed that Mr. Skok, a younger manager in the Philadelphia district, was also placed on a PIP, and Mr. Skok subsequently left employment with PetSmart.  LaCasse Dep. at 36, 51-52; Wilkerson Dep. at 71; Dubeck Dep. at  30-31.

Moreover, in addition to Mr. Allen, PetSmart issued

---

[4]    At his deposition, Mr. Allen testified that he personally visited the store of Bill Fleebe, where he observed for himself Mr. Bleebe's store conditions.  Pl.'s Dep. at 131.

PIPs to Mr. Frost and Mr. Dubeck, who were the other store
managers identified by Mr. Dawson as being the worst in the
District.  Gordon Dep. at 158-59, 253.  The evidence does not
show that the PIP program was simply a pretext to terminate these
three individuals based on their age.  In fact, Mr. Dubeck, who
is older than Mr. Allen, successfully completed his PIP and is
still employed as a Store Manager.  LaCasse Dep. at 80; Bergen
Dep. at 41; Dubeck Dep. at 10, 60-61.

        Finally, many of the individuals involved in the
decision to terminate Mr. Allen were also members of the
protected age class at the time of the termination decision.  In
February 2005, Mr. Bergen was 47 years old, Mr. Dawson was 40
years old, Mr. LaCasse was 41 years old, and Ms. Giordano was 47
years old.  Mr. Gordon was five years older than Mr. Allen.  The
decision makers' membership in the same protected class as the
plaintiff weakens any inference of discrimination.  Ziegler v.
Delaware Cty. Daily Times, 128 F. Supp. 2d 790, 812 n.47 (E.D.
Pa. 2001) (noting that because the decision maker was 53 years
old when he terminated the 60-year-old plaintiff's employment,
"the inference of discrimination is therefore less since the
decisionmaker was a member of the same protected class as the
plaintiff").

        Mr. Frost did not successfully complete his PIP and,
like Mr. Allen, was terminated.  Mr. Frost, like Mr. Allen,

brought an age discrimination action against PetSmart.  Judge
Pratter, after reviewing evidence almost identical to the
evidence Mr. Allen has presented here, entered summary judgment
in favor of Petsmart.  Frost v. Petsmart, Inc., 2007 WL 602990,
2007 U.S. Dist. LEXIS 12909 (E.D. Pa. Feb. 26, 2007).  Judge
Pratter found that:

> [T]he evidence presented to the Court is
> insufficient to raise a genuine issue of fact
> as to whether similarly situated younger
> store managers were treated differently than
> older store managers, or as to whether Mr.
> Bergen singled out older managers for any
> reason other than PetSmart's proffered
> reason: that Mr. LaCasse and Mr. Dawson
> identified their stores as the worst in the
> region in terms of a fundamental feature of
> the PetSmart business.

Id. at *8, 2007 U.S. Dist. LEXIS 12909, at * 26-27.  The Court
finds Judge Pratter's reasoning in Frost persuasive and equally
applicable to this case.

    The only significant factual difference between this
case and the Frost case is that PetSmart did not wait until Mr.
Allen completed his PIP program before terminating him.  As
discussed below, Mr. Allen's problems with the failed aquatic
system precipitated his termination prior to his completion of
the PIP program.


        (c)   The Failed Aquatic System

    PetSmart has articulated that the second reason for Mr.

-16-

Allen's termination was his failure to take appropriate action in response to the loss of fish in the aquariums at his store.  Mr. Allen devotes much of his brief explaining his ongoing efforts to fix the aquatic system in an attempt to demonstrate that a reasonable factfinder could disbelieve PetSmart's proffer that Mr. Allen did not adequately handle the failed aquatic system. He details how he ordered parts, worked with an electrician, and communicated with PetSmart to request additional help with the aquatic system.  The gist of this explanation is that Mr. Allen "did all he could to get that system running properly."  Pl.'s Brf. at 6 (emphasis in original).  Once again, however, Mr. Allen has not provided sufficient evidence to discredit PetSmart's proffered reason.

PetSmart explains that it was not Mr. Allen's failure to do anything to prevent further fish loss that led to his termination.  Rather, PetSmart states that Mr. Allen failed to show the appropriate sense of urgency in response to the dramatic fish loss on February 11, 2005, the day he was terminated.  As Ms. Wilkerson testified:

> We had a major fish loss.  No one had been
> notified, no phone calls had been made.
> [Plaintiff] lacked a sense of urgency as far
> as I was concerned dealing with the loss of
> the fish and the continuing dropping of the
> temperature for his system and that I was
> just highly upset with the entire situation
> of the lack of the regard for the lives of
> the fish. . . . I thought he acted with a
> lack of urgency in the matter.  I remember

that being the biggest issue.
Wilkerson Dep. at 44, 46.

From Mr. Allen's view, he "did all he could" in the past to remedy the failed aquatic tank system.  However, he does not dispute that, when Ms. Wilkerson arrived at his store, he was busy stacking dog food instead of attending to the fish loss at hand.  According to PetSmart, this conduct alone was sufficient to terminate Mr. Allen.  As Ms. Wilkerson put it, "bags of food are not as important as the lives of the pets in our store."  Id. at 48.  This is especially significant, because the question before the Court is not whether it was wise or whether PetSmart was mistaken to terminate Mr. Allen under these circumstances.  Rather, the question is whether there is sufficient evidence to raise a genuine issue of material fact that discriminatory animus was the cause of termination.  Fuentes, 32 F.3d at 765 ("[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.")

Put another way, Mr. Allen's "view of his performance is not at issue; what matters is the perception of the decision maker."  Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991).  The fact that an employee disagrees with an employer's evaluation of his performance does not prove pretext.  Id.  The Court does

-18-

not sit as a super employment court to decide the merits of employment decisions.  In PetSmart's view, Mr. Allen's response to the fish loss was inadequate and he was terminated on that basis the very same day.  Mr. Allen's mere disagreement with PetSmart's decision is insufficient, as a matter of law, to allow him to survive summary judgment.  <u>See also</u> <u>Frost</u>,  2007 WL 602990 at *7, 2007 U.S. Dist. LEXIS 12909 at *25-26 (noting that "Mr. Frost's own subjective beliefs that he performed as well or better than other store managers are immaterial for the purposes at hand"); <u>Cohen v. Pitcarin Trust Co.</u>, No. 99-5441, 2001 WL 873050 at *7, 2001 U.S. Dist. LEXIS 10876 (E.D. Pa. June 20, 2001) ("it is irrefutable that [the employer] viewed [the employee's] performance as inadequate and her work ethic as lacking.  It is his perceptions that count, and not what the plaintiff claims is the objective truth.")


    C.   <u>Conclusion</u>

       Mr. Allen has failed to produce evidence sufficient to permit a factfinder to reasonably either disbelieve PetSmart's articulated reasons for termination or believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the termination.  Accordingly, PetSmart's motion for summary judgment will be granted.  An appropriate order follows.

-19-

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
|  | : | CIVIL ACTION |
| KEVIN ALLEN | : | NO. 05-6760 |
|  | : |  |
| Plaintiff, | : |  |
|  | : |  |
| v. | : |  |
|  | : |  |
| PETSMART, INC., | : |  |
|  | : |  |
| Defendant. | : |  |

**O R D E R**

**AND NOW**, this **1st day of June, 2007,** it is hereby

**ORDERED** that PetSmart, Inc.'s Motion for Summary Judgment (doc.

no. 10) is **GRANTED.**

It is **FURTHER ORDERED** that PetSmart's Motion for Leave

to File to File Reply Memorandum in Further Support of its Motion

for Summary Judgment (doc. no. 21) is **GRANTED.**


**AND IT IS SO ORDERED.**

S/Eduardo C. Robreno
**EDUARDO C. ROBRENO, J.**

-20-